Argued and submitted August 29, 1984, reversed and remanded for new trial January 8, reconsideration denied March 28, petition for review pending 1986

# STATE OF OREGON,
*Respondent,*

*v.*

# MICHAEL DALE KELL,
*Appellant.*

## (10-83-01182; CA A28691)

712 P2d 827

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Defendant appeals his conviction for aggravated murder, ORS 163.095(2)(c), assigning as error the admission in evidence of two separate sets of his statements to the police: those taken after he had allegedly requested an attorney and others made after a second request for an attorney. The second set was ruled inadmissible in the state's case in chief but was admitted in rebuttal to impeach defendant's testimony. He further assigns as error the denial of his motions to grant a co-defendant immunity as a defense witness and to exclude the testimony of a state's rebuttal witness on the ground that the state had failed to comply with the criminal discovery statutes with respect to that witness. We hold that the first set of statements was inadmissible, because defendant had requested an attorney. We therefore reverse and remand.

Statements from two other suspects implicated defendant in the car bomb murder of Robert Harris.[1] He was arrested in Santa Barbara, California, for murder, on a warrant issued in Oregon. Detectives Smith and Egeter of the Springfield Police Department questioned him at the Santa Barbara police station in the early morning of January 20, 1983. After a few preliminary comments, they read him his *Miranda* rights; he said that he understood them. After a discussion of defendant's background, the questioning turned to specific matters connected with the homicide investigation. Smith testified:

"A.   When I began to focus in on his involvement, he told me that it wasn't his idea. And then I told him that we had found wires that they used where they had tested the dynamite, and that I knew that he and his friend by the name of T. J. had stolen dynamite.

"Q.   What else?

"A.   Well, from that point I had asked him if he would have gotten involved in something like this had he not known these people and his comment to me was, 'I couldn't have, it wasn't my idea.' And when I pushed forward a little further and told him, 'Well, these folks are telling me it was your idea,

---

[1] We have previously affirmed the convictions of defendant's alleged accomplices. *State v. White,* 75 Or App 722, 707 P2d 1267 (1985), *rev allowed* 300 Or 562 (1986); *State v. Harris,* 73 Or App 526, 698 P2d 1055, *rev den* 299 Or 443 (1985).

that you're the primary instigator' — I don't know if these were the precise words, but the meaning was there.

"He told me that's not so.

"Q. Why don't you give his exact words, if you have them noted in your report?

"A. He said, 'That's a raft of bullshit.' He said, 'It's my idea, huh?' And he gave me the impression at least that he was becoming angry with these people for putting the blame onto him. And he said, 'Well, I'm not going to go any further with this until I speak to a lawyer.' And as I started to comment, 'Well, let me tell you this though,' he interjected, 'No, I mean I'm talking to you about it, but as far as this, my idea, I want to talk to a lawyer because this is a bunch of bullshit.' And I asked him then, 'Do you want to talk to us?' and he said, 'Well, yeah, doesn't matter to me.' And then I began further questioning about the incident itself."

Defendant went on to make other incriminating statements.

The trial court ruled that defendant's invocation of his right to counsel was "equivocal." Although on appellate review we are bound by the trial court's findings of historical fact—"[w]hat actually transpired"—if there is evidence to support them, we are not bound by the court's conclusions based on those facts. The determination of the legal effect of the historical facts is a matter for our review. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968). We must then determine whether the trial court's conclusions concerning the legal effect of those facts was correct. We first turn to what law governs the issues in this case.

Defendant argues that the state's use of his inculpatory statements taken after he had allegedly invoked his right to counsel violated his right to be free from self-incrimination under Article I, section 12, of the Oregon Constitution.[2] He makes no separate claim under the federal constitution. Instead, he asks us to adopt the rule of *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981), under the Oregon Constitution and to hold that the questioning in this case violated that rule.

---

[2] Article I, section 12, of the Oregon Constitution provides in pertinent part: "No personal shall * * * be compelled in any criminal prosecution to testify against himself."

■ In *State v. Flores,* 280 Or 273, 279, 570 P2d 965 (1977), the Oregon Supreme Court, relying in part on a law review article, suggested several criteria to consider in engaging in an independent interpretation of the state constitution:

> "(1) the similarity of the state and federal provisions; (2) relevant state precedents; (3) unique local conditions; and (4) the position taken by the United States Supreme Court. To these considerations we would add a fifth—the need for a uniform standard in the area of law under discussion."

More recently, the Supreme Court has adopted our statement that no other court's decision can be controlling authority on the meaning of the Oregon Constitution: "In that respect, a United States Supreme Court majority is no more binding in Oregon than is a United States Supreme Court minority, a decision of the Supreme Courts of Hawaii, California, or Georgia or a well-reasoned law review article." *State v. Soriano,* 68 Or App 642, 645, 684 P2d 1220, *opinion adopted* 298 Or 392, 693 P2d 26 (1984).

We must evaluate defendant's argument for the adoption of the *Edwards* rule in the light both of Oregon's sole responsibility for the meaning of the Oregon Constitution and of the benefits of adhering to rules which are widely followed outside Oregon and which are generally considered satisfactory. Although no authority outside Oregon can control our decision, there is no value in being different merely for the sake of the difference. That other courts generally follow a particular rule and that it appears to work satisfactorily are reasons that would weigh heavily in favor of adopting it in Oregon. The Supreme Court often emphasizes the inadequacy of other approaches when it makes a special rule under the Oregon Constitution. *See State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983) (adopting a special Oregon double jeopardy rule, because neither that espoused by the United States Supreme Court majority nor that supported by the minority is fully appropriate); *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982) (reestablishing state search and seizure rules because the federal rules are confusing and inadequate).

The Oregon Supreme Court discussed the admissibility of confessions under the common law, statutes and Article I, section 12, in a number of cases beginning in

1881 and continuing into the 1960's.[3] The cases are by no means consistent concerning the consequences of failing to inform a suspect of his or her rights before questioning. However, the Supreme Court has recently gone a long way toward resolving that issue and, as a result, we need not examine the earlier cases in detail. In *State v. Sparklin,* 296 Or 85, 672 P2d 1182 (1983), the court refused to require that a suspect be given more detailed warnings than *Miranda* requires before police questioning. It did so because it did not believe that the alternative warnings were a sufficient improvement to justify a variation from the federal rule "[a]t least as long as the text of the federal *Miranda* warnings remains the law * * *." It then specifically held that Article I, section 12, requires "the police to inform a detained person that he may terminate questioning at any time and that he may have an attorney to advise him before he speaks." 296 Or at 89. We construe *Sparklin* as adopting the *Miranda* warnings under Article I, section 12.[4]

Once we conclude that Article I, section 12, requires that suspects be given *Miranda* warnings before custodial interrogation, the next question is what the police may do when a suspect asks to consult a lawyer. This is the question the United States Supreme Court considered in *Edwards v. Arizona, supra,* where the defendant had been arrested and taken to the police station for questioning. On being told that he had been implicated in a crime, he requested counsel and asserted his right to remain silent; questioning ceased. The next day, however, police officers again initiated questioning, without providing counsel, and obtained a confession. The

---

[3] Among the cases are *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482 (1965); *State v. Kristich,* 226 Or 240, 359 P2d 1106 (1961); *State v. Nunn,* 212 Or 546, 321 P2d 356 (1958); *State v. Henderson,* 182 Or 147, 184 P2d 392 (1947); *State v. Layton,* 174 Or 217, 148 P2d 522 (1944); *State v. Moore et al,* 124 Or 61, 262 P 859 (1928); *State v. Butchek,* 121 Or 141, 253 P 367, 254 P 805 (1927); *State v. Stevenson,* 98 Or 285, 193 P 1030 (1920); *State v. Wilder,* 98 Or 130, 193 P 444 (1920); *State v. Morris,* 83 Or 429, 459, 163 P 567 (1917) (Burnett, J., dissenting); *State v. Spanos,* 66 Or 118, 134 P 6 (1913); *State v. Garrison,* 59 Or 440, 117 P 657 (1911); *State v. Andrews,* 35 Or 388, 58 P 765 (1899); *State of Oregon v. Moran,* 15 Or 262, 14 P 419 (1887); *State v. Witzingerode,* 9 Or 153 (1881). Cases decided from the late 1960's through the early 1980's were usually based on the federal, rather than the state, constitution.

[4] In *State v. Mills,* 76 Or App 301, 311, 710 P2d 148, (1985), we assumed without deciding that the *Miranda* rule applies under the Oregon Constitution. The dissenters would have held specifically that it does. 76 Or App at 311 n 1 (Newman, J., dissenting).

Court held that there had been no valid waiver and that the defendant's confession was therefore inadmissible:

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona, supra,* 451 US at 484. (Footnote omitted.)

■    *Miranda* has been federal law for almost 20 years and, despite some grumbling, is generally accepted; under *Sparklin,* it is the law of Oregon. *Edwards* is a reasonable and workable application of the *Miranda* principles. We see no need to develop a different rule under the Oregon Constitution. Keeping in mind the benefits of a uniform standard when that standard will sufficiently protect the rights of Oregonians, we believe that the *Edwards* rule is proper and adopt it under Article I, section 12, of the Oregon Constitution.[5] We turn to the application of *Edwards* to these facts.

Under *Edwards,* a suspect who is in custody and who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him * * *." 451 US at 484. The suspect may, however, waive the right to counsel and statements may be admitted into evidence if the suspect (1) initiates further discussions with police officers and (2) the waiver of the right to counsel is made knowingly and intelligently. 451 US at 484, 486 n 9. The initial inquiry is therefore to determine whether defendant invoked his right to counsel. In *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the Supreme Court stated that a suspect invokes the right to counsel when

_____

[5] In adopting *existing* federal standards as the law under our own constitution, we are not subject to subsequent changes in federal law. *State v. Caraher, supra,* 293 Or at 749. Our adoption of *Edwards* is thus not necessarily an adoption of later federal cases which purport to apply it. *See, e.g., Oregon v. Bradshaw,* 462 US 1039, 103 S Ct 2830, 77 L Ed 2d 405 (1983).

"he indicates in *any* manner and at *any* stage of the process that he wishes to consult with an attorney before speaking * * *." (Emphasis supplied.)

The United States Supreme Court recently considered an example of how a suspect may invoke the right to counsel in *Smith v. Illinois,* 469 US ___, 105 S Ct 490, 83 L Ed 2d 488 (1984). The defendant was in custody and was being interviewed by the police. During the reading of his *Miranda* rights, the following exchange occurred:

"Q.   You have the right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?

"A.   *Uh, yeah. I'd like to do that."* 469 US at ___ (83 L Ed 2d at 492. (Emphasis in original.)

Despite that statement, the police questioned Smith, and he eventually made incriminating statements which were admitted at trial. He was convicted. The Court noted that ambiguities or equivocations may either "(1) *precede* an accused's purported request for counsel, or (2) [be] part of the request *itself."* 469 US at ___ (83 L Ed 2d at 494). (Emphasis in original.) However, no ambiguity or equivocation *after* the request can affect the duty of the police to stop questioning until the suspect has counsel. Because the lower courts had construed Smith's request as "ambiguous" by looking solely to statements made *after* his request for an attorney, the Court reversed the conviction. "[A]n accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." 469 US at ___ (83 L Ed 2d at 496). (Emphasis in original.) We adopt this construction of *Edwards* under Article I, section 12.

■   We turn to the specific and crucial exchange between the officers and defendant. Defendant had been advised of his rights and had entered into a preliminary discussion. However, when the officers indicated that the other suspects were focusing blame on him, defendant said, "Well, I'm not going to go any further with this until I speak *to a lawyer."* There is no ambiguity. Defendant *had* invoked his rights.

Although the state argues that comments made before defendant's alleged invocation created some ambiguity, it relies primarily on the argument that defendant's statement

must be "viewed in its totality" and proceeds to use defendant's post-request statements to establish that his invocation of his right to counsel was equivocal. The trial court also relied on defendant's post-request statements in concluding that the invocation was equivocal. "This line of analysis is unprecedented and untenable." *Smith v. Illinois, supra,* 469 US at ___, (83 L Ed 2d at 495). Although the officer spoke before defendant could finish his request, defendant did in fact ask that questioning cease until he could talk to a lawyer. That the officer's statement provoked a response in which defendant apparently agreed to keep talking does not justify the continued questioning; it is exactly what the *Miranda* and *Edwards* rules are designed to prevent. The historical facts do not justify the trial court's conclusion that defendant's invocation was "equivocal" and could thus be ignored. The police should have stopped questioning defendant; any statements he made after his request must be suppressed.[6] The failure to suppress requires reversal of defendant's conviction.

Defendant's other assignments of error do not require lengthy discussion. He argues that it was error to allow the use for impeachment purposes of statements which the court had suppressed, because they were taken after he had requested an attorney.[7] We decided this point adversely to defendant's position in *State v. Mills, supra* n 4. Defendant's attack on the use of a surprise impeachment witness on rebuttal is unlikely to arise on retrial.

Defendant's final assignment concerns the court's refusal to grant use and derivative use immunity under ORS 136.617 and ORS 136.619 to Barbara Harris, an alleged co-conspirator who was then awaiting trial, so that she could testify in his behalf. Since then, Harris has been convicted, and we affirmed her conviction on appeal. *State v. Harris, supra* n 1. In addition, the legal basis for use and derivative use immunity has been altered by the decision in *State v. Soriano, supra,* and the subsequent amendment to ORS 136.619. Or

---

[6] The state has not shown either that defendant initiated the further interrogation or that he thereafter waived his right to counsel in the manner which *Edwards* requires. Indeed, because the officer initiated the additional conversation, waiver was not possible.

[7] This request for an attorney came after the one at issue here; the court held it to be unequivocal.

Laws 1985, ch 709, § 1. It is questionable whether Harris' right not to testify against herself continues to exist after the affirmance of her conviction. She did testify at her trial, and defendant may be able to use that testimony, if he considers it favorable. *See* OEC 804(3)(a). In short, the situation at the retrial will be so different from that at the first trial that any ruling we made now would be of only academic importance.

Reversed and remanded for a new trial.